If you are the appellant, if you aspirationally would let me know how much time you would like to reserve for rebuttal, that would be helpful. And we're ready to start. Good morning. Good morning, Your Honors. And may it please the Court, Elizabeth Richardson Royer on behalf of Ernest Prescott. I'm sorry not to be there in person, but it's nice to be here anyway. I plan to reserve four minutes for rebuttal, but I'll keep an eye on the clock. Thank you. Ernest Prescott's co-defendant, Jason Jones, has tried repeatedly to explain that it was he, not Prescott, who shot and killed James Johnson. He tried before trial when he asked his lawyer to give a confession letter to the DA. He tried to testify at trial, which his lawyer did not permit. And after trial, he sat for a lengthy recorded interview and signed a declaration insisting that he and not Prescott was the shooter. But despite his efforts, the conviction still stands. And this is for two reasons. First, trial counsel performed ineffectively when he failed to use a qualified document examiner to authenticate Jones's two confession letters. And second, the state court unreasonably denied Prescott's actual innocence claim without holding a hearing. And then the district court below mistakenly denied that claim as well as based on state law grounds alone. I only have limited time. You state in your opening brief, it argues that Prescott is entitled to relief based on a freestanding actual innocent claim. But your reply brief concedes that the claim is not based on clearly established law. Can you clarify, one, whether Prescott is asserting a claim under 2254 D1, and two, if not, what the statutory basis for your freestanding actual innocence claim is? Certainly. Prescott is asserting an actual innocence claim because he is actually innocent. And the reason that the Anti-Terrorism and Effective Death Penalty Act does not preclude this court's de novo review is because the state court unreasonably determined the facts under 2254 D2 when it refused to hold an evidentiary hearing, which was necessary in order for the court to assess credibility. So is it your view that you can have a cognizable claim in habeas based on a D2 error with respect to an issue of state law? No, Your Honor. This is not a state law claim. This is a federal constitutional violation based on Herrera and this court's decisions acknowledging or assuming the existence of an actual innocence claim. The reason we surpassed 2254 D2 is because the state court refused to hold the requested evidentiary hearing, which made- But are you saying there's clearly established law? No, Your Honor. And that's why we haven't asserted that the state court's decision was an unreasonable application of clearly established federal law. So your view is that under, if you're asserting D2, you escape the confines of the clearly established law restriction and you can just apply any federal law up to the date? That's correct, Your Honor. And that's based in the language of the statute as well as this court's decisions, which have adopted that reasoning. For example, in Davis v. Griegas, which we cited in the opening brief, the court found this was at a time when in this circuit, the court had held that there was no clearly established federal law providing for ineffective assistance of counsel at non-capital sentencing. And despite the absence of clearly established federal law at that time, this court in Davis v. Griegas held that the state court's decision was unreasonable under D2 and remanded for an evidentiary hearing. And that is what we're asking the court to do here with respect to the actual innocence claim. So Davis is your best case for the authority for the proposition that 2254 D2 can be used to second-guess a factual finding made by a state court in the context of adjudicating a state claim? Is that your best authority? Your Honor, that case is directly on point that the court did exactly what we're asking the court to do here and it complies with the language of the statute as well. This was a case, correct me if I'm wrong, but wasn't this a case in which the state court summarily dismissed it so that essentially the only inquiry they conducted was whether there was a prima facie case? How is that a circumstance in which there was a determination of facts in light of the evidence presented in the state court proceeding? It seems like they took the facts as true and then it becomes a legal issue, which would mean D1 is the relevant one. Well, in this circuit, there are a large number of cases where the court has found a D2 violation despite a summary denial. So Nunez is the case that I think is most directly on point. That also involved an ineffective assistance of counsel claim where the state court summarily denied the habeas petition. And this court found that because in order to do that, the state court would have had to make credibility determinations, that its denial of an evidentiary hearing meant that its decision was unreasonable. That sounds like a determination that if you take the facts as true, that there's a problem, that you need to reject part of the facts. So I understand that, but I wonder whether it really does fit within D2 as opposed to a legal determination. Well, that is the law here. And in this case specifically, if the court had truly accepted Prescott's allegations as true, then he would have obtained relief. The only way that the court could have denied relief is by finding, for example, that Jason Jones' confession letters and declarations were credible. And the court could not do that. You could make the determination that taking the facts as true, he's actually innocent, but that he has no basis for relief under D1 because it's not clearly established that that establishes a federal claim. I'm sorry, Your Honor. Can you repeat that? I just want to make sure that I address. You said if you take the facts as true, you'd have to grant it. But if you take the facts as true, his contention that he's actually innocent, then wouldn't that then turn you to look at whether there is clearly established federal law and you conceded that there isn't on the actual innocence claim? I was referring to the state court's decision and trying to explain that the state court, if the state court had properly assumed that the allegations were true, it would have granted relief. And so because its decision was unreasonable on that basis, this court can. It would have granted relief on what grounds? Actual innocence. The only way it could deny that claim, the state court, is by finding Jones' lacked credibility. And it could not reasonably do that without a hearing. Now, once we get past 2254D, this court could either find under de novo review that the allegations show actual innocence and grant relief, or it could remand to the district court for an evidence hearing. But if we were to determine that they show actual innocence, how could we grant relief if it's not clearly established? Because we have already moved out of the realm of 2254D by satisfying D2. Now the court's review is de novo. We don't need clearly established federal law. That is only necessary under D1. The core of your claim is that the state court refused to grant a hearing, and that the only way they could do so was because they made an unreasonable determination of fact. Correct. And so this court can review de novo because we have satisfied D2, and under de novo review, the court could either grant habeas relief or remand for the district court to hold the evidence hearing that is so necessary in this case, where a 16-year-old is serving a life sentence, and the actual killer has repeatedly confessed. This court is absolutely empowered to do that. The state court's... So you're giving us... Okay. It's hard for me to get out of... So I understand your argument is 2254D2 is Prescott's new evidence established to primate face a case for actual innocence under state law, and that the state law's failure to hold an evidentiary hearing to assess that new evidence constituted an unreasonable fact finding procedure. Is that right? That's correct. Okay. And then you pull yourself out of that, and then you say the only... Then we can grant you relief de novo, but we can't deny you... If we can go de novo, why can't we deny you relief too? Oh, you could, Your Honor. Of course, under de novo review, the court can do either one of those things. However, I think that without an evidentiary hearing, that would be improper here, because then this court would be doing what the state court did and making credibility determinations without a hearing. So... And just to be... Yes. Go ahead. Go ahead and finish your thought. To the extent the court is troubled by, and Judge Callahan, it's troubled by the idea that the state court can unreasonably deny an evidentiary hearing under its own state law, and therefore D2 is satisfied, that's exactly what happened in Brumfeld v. Kane, and we've discussed that case in our briefing, but this is not a novel idea. I'm not suggesting that this court... Well, I think it's a little more... It's a little more novel than you're acknowledging, because we don't see this. I've never seen it before, so it's a little more novel than I think... It's pretty hard to wrap your head around. Well, this is what... And so, I mean, one of the cases that I cited in the brief was a case that I argued several years ago, Velasquez, where the court did exactly what I'm asking the court to do here, and that is found that the state court's denial of an evidentiary hearing was unreasonable under D2, and remanded for an evidentiary hearing in the district court, and that's what the court should do here. Do you want to reserve the balance for a rebuttal? I would really like to... Oh, no. Go ahead. I would really like to go into the IAC and the actual innocence claims. Okay. That's fine. I'll still give you some rebuttal time, so just answer judge questions. Yeah. So I'd like you to tell me what's your best case for actual innocence. I've read the record. I've read the confessions. I've read your second document, examiner's testimony. But there were still eyewitnesses who identified your client rather than Mr. Jones. And we would have to ignore that evidence in order to give credence to Jones's confession. Well, also, too, to add to that, there's also your client's... He made a confession, as it were, after he fled the juvenile facility, where he said he killed someone, but he's sorry, please forgive me or find me not guilty. And that came into evidence, too. Correct. So as to Judge Mavi's point, the court does not have to ignore the eyewitness identification. You know, under Herrera and Schlup in these cases that talk about the actual innocence inquiry, the court looks at all of the evidence. And so... Right. But if we've got an eyewitness who's been deemed credible by a jury, then how do we make a judgment that your client is actually innocent? Well, I think that witness was so deeply problematic for so many ways that I would love to explain. The point is, though, that when the jury found her credible, it had nothing else to suggest that Prescott wasn't the killer. And so it really likely would not have made that same determination if it had any other option because she was the sister of an individual who killed Prescott's friend and was sent to prison for that. She was an associate of the rival gang. But as between Jones and Prescott, why would she have a preference for fingering Prescott instead of Jones? Because before she ever identified Prescott, she went on MySpace and she saw Lakeisha Williams's MySpace page. She knew and disliked Lakeisha Williams. And on that page, there was a picture of Lakeisha with Prescott. So when the detective showed her a photo array with Prescott's photograph in it, this was not a fresh identification. Okay, but did that come out in front of the jury? I'm sorry? Did that come out in front of the jury? Was she impeached with that at the time? She was impeached with that, Your Honor. All right. So it's... So why... You're asking us to reweigh that and say she's not credible. I'm asking the court to reweigh the evidence in light of the new and very compelling evidence of innocence. That's correct. Okay. So let's look at the evidence. So we've got... We have two different confessions plus the stuff after the interview with the investigator afterwards. What are the two letters that were available at the time? One of them fingers somebody called Poonie. Now, I understand that your investigator probed that and he said, well, Poonie was just a... Was it just a made-up name? Was that his explanation? My understanding is that it was not a made-up name, that Poonie was a nickname for Nicky Donald, who was pulled over and connected with the firearm that was used in this crime. Okay. So I think... So now we have... Now the evidence in the record of actual innocence depends on which of the two letters we're willing to accept because one of them fingers somebody else. So we now have Jones who has said that he didn't do it and that Prescott did. Then he says that it was Poonie and then he says that he did it. So we now have Jones on record identifying three different people, including himself, as the perpetrator. Well, I think it's easy, Your Honor, to understand that in his first attempt at confession, he was not ready to take responsibility himself, but he had serious guilt about pointing the finger at Prescott and so he decided to say that it was the person who was found with the gun. But that is not a reasonable interpretation of what actually happened because Nicky Donald was not involved in this offense. And so... Well, is it... But didn't in the trial, though, too... I'm just sort of... When there was evidence that Prescott had Poonie's number who was found... And they... That was... They did identify the murder weapon, correct? Ballistically. But it wasn't with your client, but it was with Poonie and they put in evidence at trial that your client had Poonie's number and something about that. The other way around. So Poonie had my client's number among hundreds of other numbers in his phone. Okay, but there was evidence of a connection between the two of them somehow. Yes. And the fact that Jones knew Poonie as well, he's connected with him. And this is a pass-around gun that Lakeisha Williams... there was evidence that the court had that your client did not want to testify and that the lawyer that was representing your client at the time did try to see if he could say that it was Jones. I mean, there's a lot of evidence about whether this person, whether it was Jones that had written it, and then you later present someone that says, well, they think that they can say it, but at the time this person was pretty extensive, had testified many times as an expert and said that it was inconclusive. And then the fact that, as Judge Bybee pointed out, there were fingers pointed at different people and he still had to get it into evidence and he made a tactical decision that that wasn't what he was going to do. So you have all of that you've got to overcome too, right? I disagree that he made a tactical decision not to present the letters. He explains in his declaration that he wanted to present them and that he hoped that either Jones or Prescott would testify so that he could get them in. But then there was a really weird thing too in the record, which I've seen a lot of, I've done a lot of criminal in my life, that the lawyer said he wanted to keep them being tried, he wanted to keep them detained together so that he could figure out Jones's trial strategy, that somehow they were going to, that never has occurred to me in all of my years doing this, that defense counsel tries to figure out the strategy of the other people through keeping the two together. But maybe it does happen. No reasonable lawyer would fail to turn this letter over to the DA, as he explained, because he wanted his teenaged client to stay in jail and gather intel about the co-defendant's strategy. That is ludicrous. There is no possible strategic tactical reason for doing that. So I agree that is true. I see the reason to do it, but I think it probably has some ethical problems, possibly. But anyway, Judge Bybee has another question. So on the IAC claim, the basis of your claim is that he had an unqualified document expert. Now, going and getting a second opinion is a different problem than putting somebody who is unqualified. Is it your claim that had the document expert been called at trial, that he could not have been qualified as an expert? How do you have a guy who's worked for the public defender's office for 40 years, been trained and testified in 300 cases, disqualified as an expert? I didn't mean to suggest that he might not have been qualified in court to testify as an expert. I mean to suggest that when you look at his CV and you see that his most recent training was from more than 30 years prior, that is a huge red flag. And normally, you know, a defense lawyer is not obligated to go and get a second opinion where the first one comes out the way he doesn't want it to. But if DeGarmo has been working with the PD's office for 40 years, they have a long history of working with him, why would it occur to them that they would have to go to somebody else? It would occur to them, to any reasonable lawyer, because when you select an expert, it is not enough just to use somebody that you're familiar with. You have to look at their qualifications. But qualified by a court 300 times? That doesn't... His training is not up to date, and that is clear from his CV. Now, you know, whether he could have been qualified as an expert despite his lack of current training is unknown. But where your 16-year-old client's life is on the line and you're using an expert whose training is outdated, who comes up with an inconclusive answer, which is not an answer that is accepted in that field, either you don't use that expert or you do get a second opinion in this case. And our Strickland expert in the State Habeas Proceedings, in his declaration, Stephen Weiss, made clear that no reasonable lawyer would have stopped the investigation at the point that Mr. Plain did here. Mr. Plain told prior counsel for Prescott in his declaration that he discussed with his colleagues, so he went to other lawyers in the public defender's office, various decisions, including the one whether to sever the trials, which seems to me probably to have been a mistake not to have tried to sever these cases. But he notes there that Prescott had, quote, so much evidence against him that he just thought that the letter was a wild card and that it was not going to be good judgment to present it. So what are we supposed to do with the fact that Prescott's lawyer thought there was so much evidence against him? He was wrong about that. This case... Well, I guess if you want to say he was, you could say he was wrong, but 12 people convicted him, so he wasn't entirely wrong about that. It's a different view than yours, clearly. Correct. Correct, Your Honor. When you look at the evidence against Prescott in this case, it's this really problematic eyewitness identification from an incredibly biased witness. It's a police interview from Lakeisha Williams who recanted, got immunity, and is entirely unreliable anyway. And it's a phone number in a phone of the person who had the gun. This is not overwhelming evidence by any stretch, and I will say that in Mr. Plain's declaration, he says that it seemed like a wild card as a way to explain why he didn't act on it right away, but in that same paragraph he explains that part of the reason for his failure to try to sever the cases and not to take this letter to the DA, for example, was because he wanted to have it authenticated. And that's what he tried to do, but the way that he did it fell below the reasonable standard of care. I have a question about one of the handwritten letters by Mr. Jones. I notice it's the one that invokes Poonie's name. I notice that there are two different versions in the record. Was one of them written later on? Was that written for the investigator? Is that what happened? That's what happened. Patricia Fisher asked the investigator to dictate the contents of that letter. And have him write it down. I have one question going back to the issue of Nunes and the applicability of D2. One of the things that Nunes relies upon in stating in the alternative that D2 might be applicable there is that it says with the state court having refused Nunes an evidentiary hearing, we need not, of course, defer to the state court's factual findings, if that is indeed how those stated findings should be characterized when they were made without a hearing. And then there's a footnote that says that it is particularly unacceptable for that court to have eschewed an evidentiary hearing on the basis that it was accepting Nunes's version of the facts, than to have given a lie to that rationale by discrediting Nunes's credibility and rejecting his assertions. So it sounds like, even though it arose in a prima facie context with no evidentiary hearing, that there were stated findings or a stated version of the facts. Do we have that here? And if we don't, does that distinguish Nunes in terms of the basis for applying D2? My understanding, and I looked at this case last night, and so it's possible that I got it wrong. But my understanding was that it was a summary denial. And so I can look at that. But the language I just read does not suggest that. It says stated findings. Correct, Your Honor. So I will have to take a second look at that case. But this court has, you know, in the Velazquez case that I cited, found D2 satisfied, where there was a summary denial in other cases. And I can point the court to those as well. All right. Do my colleagues have any additional questions? Obviously, we've gone about 11 minutes over. So I'll make a decision after we hear from the other side whether to, if my colleagues want any rebuttal time. All right? Thank you. Thank you. All right. Good morning. Good morning. May it please the Court. Jill Thayer on behalf of the Respondent. I think this court is aware that it cannot create clearly established Supreme Court law. And there is no cognizable federal right to freestanding actual innocence claims. And even Herrera and some of the other Supreme Court cases have discussed it only in terms of capital cases. And this isn't a capital case. Now, the cases that Petitioner is relying on, the underlying claim was all a cognizable claim. Taylor v. Maddox was Miranda-Edwards. Nunes, Hibbler, Velazquez were all ineffective assistants. Brumfield was Atkins. So those are cognizable claims. And then you can go to D2 and look at the factual finding. I actually don't know about Davis, and I apologize for that. I don't recall. But I'm going to guess that there was an underlying real cognizable claim in Davis as well. So can you respond to Prescott's argument that the state's court's failure to hold an evidentiary hearing to assess Prescott's new evidence constituted an unreasonable fact-finding procedure under D2? Well, I'm not—I understand the argument. And in California, California law does authorize freestanding actual innocence claims. So the only way this works is if the argument is the state court should have granted a hearing based on California law, that doesn't give a claim. That doesn't make a claim. The fact that California law provides freestanding actual innocence claims doesn't suddenly mean that federal courts authorize freestanding innocence claims. It is stated in response to a question I asked your opposing counsel said, no, I'm not making the California actual innocence claim. It's a federal actual innocence claim, and I don't have to worry about its lack of being clearly established because I'm not going through D1. I'm going through D2. So the question is whether or not D2 does allow an assessment in this context that we could find a D2 error and then proceed to the merits of the federal actual innocence claim. And the answer is just no. If there is no claim, then they can't have unreasonably determined the facts because the facts are not just out there in the middle of nowhere. You apply the facts. Ultimately, the court applies the facts to the law. Am I reading the procedural posture correct that what the California Court of Appeal necessarily did or should have done, and we read the summary denial as having done, is taken the well-pleaded allegations of the petition as true and then concluded that they don't state a prima facie case for relief? Is that, am I reading the procedural posture correct? Well, this, that is correct. But I would like to explain what Duval and the state courts do. They don't ignore all the evidence of guilt and believe the truth of Mr. Jones's declaration. They don't read it and say, Mr. Jones and Mr. Prescott now say that Mr. Prescott is innocent and Mr. Jones is guilty, and we're just going to believe that and immediately grant a hearing. That would mean every single defendant gets a hearing, right, because any defendant can write a declaration and say, I didn't do it. What the state court does is they look at all of the evidence and they look at the evidence in the declaration and they can say, okay, let's say Mr. Jones does come in and say, I did it, Prescott had nothing to do with it. The state court can also look at what would a jury do? Is that enough to show it? And in this case, you have a convicted felon, you have the three inconsistent statements where he said Prescott did it, then Pooney did it, now he's saying, after he's acquitted, after he's acquitted, and then he won't talk to the investigators until Mr. Prescott has been sentenced. Now, the state court can look at all of that and then decide if there's a prima facie case. And here, even under federal law, even under SHLUP, even under all of that, none of this comes even close to meeting any standard for actual innocence. It is very troublesome that Jones did write something before Prescott was convicted saying, look, I'm really sorry, I did this. Well, first of all, it's not totally clear that Jones did that. But even if you're assuming he did, the fact that he refused to take a plea after he supposedly wrote that letter indicates he was not willing to take responsibility. And the fact that he did not give a statement or talk to Mr. Prescott's investigator until after he was acquitted and after Prescott was sentenced. You recall in the record, it's very clear that Prescott said Jones would talk to an investigator and the investigator tried to talk to him and he said, I'm not comfortable talking to you just yet, and then he waited and waited and waited. So someone who admits to murdering someone after they've been acquitted and they have no criminal liability, that is a very different status. And this court and the state court certainly can take that into consideration. Did Jones testify at trial? No. I want to make sure I understand your position on this issue about the procedural posture. Is it your view that the Court of Appeal in summarily denying the petition was entitled to and may have sort of weighed the various competing items of evidence and made a discretionary assessment of them? They don't make credibility determinations. The matter is they look at that declaration. If a jury saw, well, the declaration and then the letter and so forth, what does it show? Well, and then they look at all the evidence too. They look at the totality of the trial evidence. That's correct. And they can look at the whole, yeah, they look at everything. They look at the trial. They look at the declarations. You know, there was a very long state habeas petition, and I believe, I'm pretty positive, that they also requested further briefing in this case. The state court did. So they can look at all of it. You know, they don't wholesale need to believe Jones' latest declaration. So they're just assessing it at that point whether it needs to go to a hearing? Correct. Or whether it can be denied without a hearing? That's correct. Yes, Your Honor. Was Prescott's trial counsel under any obligation to ensure that the handwriting expert's qualifications were up to date? And if so, is there any evidence that counsel did so here? Well, certainly, you know, the Strickland standard is reasonableness. And so it's certainly reasonable to find a reasonable expert. So if he had gone on the street and asked someone to compare some handwriting, that would be unreasonable. But here, in the facts of this case, he contacted the document examiner who had been the in-house document examiner for the Alameda County Public Defender's Office for the past 30 years. He was a little bit older, and it looks like he left in 2006. But then he had kind of this independent examination. So he was retired, but he was extremely well qualified. It's just a matter of reasonableness. And that, of course, is a large standard. And then, of course, the state's application of that standard is also given deference by this court. Here, it's very clearly reasonable that he contacted someone who'd worked in his office for 30 years and had fairly recently retired and was still available and doing this type of work. So let me – all right. So I understand Petitioner's counsel to say that it's how she gets around D-2, that it was a failure. The state court's failure to hold an evidentiary hearing was an unreasonable fact-finding procedure. And then by establishing that, then she's in de novo review. And then, as she said, then you have to grant this because they should have – if you look at it, there should have been an evidentiary. It should be remanded. And I said, well, could we have the option to look at it and say, well, there wasn't any IAC here. So I'm assuming you're saying she doesn't get out of D-2. She doesn't – she can't establish. She doesn't get out of D-1 here either. But let's say we disagree with you at any juncture. Tell me how – give me your analysis relative to D-1, D-2, and then if we disagree with you at any juncture, what is then – what are the court's options at that point? Well, part of the issue here with the D-2 and trying to turn – change it from legal to factual and then jump into D-2 is that there needs to be some kind of factual determination to make. And here, there really isn't a factual determination to make. There's an inference that there's been some kind of a factual determination, though, right? We know what the state courts are supposed to do when they review these petitions. So we assume that the court behaved regularly. This is an application of the facts to the law. This isn't a this person said this and that person said that. I think we can say here's one of these situations where the state can say, okay, let's say Jones wrote this letter and that he would tell a jury that he did it now that he's been acquitted and so forth. What does that even show? It doesn't show anything, and that's a facts to the law. That's not – even in reply, the reply brief, petitioner couldn't really say, these are the facts that will come out at the hearing. In other words, some district court judge needs to look at Mr. Plain and look at Mr. Weiss and decide what's reasonable, what's a reasonable thing for a reasonable attorney to do. The courts do that. That's a legal determination, or that's a facts to the law determination. There's just no facts to even be looking at here where you would say there's an unreasonable determination of the facts. Again, you look at the standard. You can look at the Schlepp standard. You can look at what happened here. You know, the Mr. – Well, I guess you can look at all of those things and obviously and peek under the covers, but I'm trying to ascertain your argument of where you think it stops first, and then if we disagree with you. I'm understanding your argument to say that there's no clearly established law and that's the end of it. That's correct on the first claim, that there's no clearly established law. The freestanding innocence, it's not cognizable. Now, with the ineffective assistance, there absolutely is a Strickland claim here, certainly, and I would say that here the district court was correct, and this court can look at that decision to say, well, he assessed the expert, and that, again, there's no clearly established right to have your attorney, whatever, research, spend X amount of time researching their experts. It's just very general what's reasonable under the circumstances. Well, and let's just assume, I'm just assuming if we didn't agree with you that he should have done more on prejudice, what's your analysis on prejudice on the IAC? Okay, I just want to point out one other thing. The letter didn't come to him until the middle of trial, so this court can also consider that, the time frame, and I did notice that Fisher and their expert, later expert, none of them say how long it took Fisher to figure out any of this, so Mr. Plain was working in the middle of trial with this letter, which is hinky because Jones has already, but I understand. You want me to get to prejudice? No, that's important. That's important contextually. He didn't have it two months before trial started. Correct, yes. So he gets the Jones letters, or, well, there's two, but he gets the first Jones letter, how far into trial? Well, that he got early. The first one blaming Pooney was earlier, and he handed that to Jones' attorney. Was that before trial or during trial? That was before trial, and then the second letter where he takes response, Jones, says he did it, that was on the second day, so I think it was during jury selection, but it was when he was very busy in the middle of trial, and this court can consider that. Now, on the prejudice, again, it's the same as kind of the actual innocence. Then this court looks at all of the evidence and looks at Perry and all of her descriptions and then contrasts that with Jones' letters and so forth, and it's only, though, what Mr. Plain had at the time, and then it gets very tricky on the prejudice because who knows what would have happened? Who knows what would have happened? Would Jones have written representative samples? He was a co-defendant. You know, Fisher wanted those representative samples, which are in the record where it sounds like, although I couldn't read it but it could be in there, that they dictated the letters, but he had already seen those letters. But anyway, it's all to say that who knows what would have happened. Would he have provided the samples, which he said were important? Would the district attorney have hired an expert like DeGarmo who would have said, no, you can't tell? Would it have been admitted into evidence? The letters have been admitted into evidence. And then in that case, would Jones have testified? And who knows what he would have said? When he was being tried now, he had to— Did Plain have a theory presented at trial as to who did the shooting? He did not finger Jones. He sort of had this idea that Duder or someone else did it. It was really a my client didn't do it and all of it. He definitely attacked Perry's credibility and so forth, but he did not point the finger at Jones at trial. Other than the eyewitnesses, that is Lakeisha Williams and the other woman whose name is escaping me who saw him through the window, was there any other physical evidence that tied him to this murder? Well, the surveillance videos. And then— And the surveillance video shows what? Well, it shows the two of them. And we're all very clear that one is Prescott and one is Jones, and nobody's contesting that. And then you have Perry saying— And what is the timing of the surveillance video relative to the murder? It shows the car coming in, them running out. Then there's a few minutes, and then Duder, the young guy running after them, and then they all run back to the car. So it's at the time, and then there's actually two. So one shows the car and then back and forth, and then another just shows Mr. Prescott and Mr. Jones, and it shows them a little closer up, but it shows there, and that's in the record, some stills are in the— Doesn't the eyewitness also describe the car? Did she describe the car? I don't think she describes the car. No, no, she didn't see the car. But that was—you could see the car from the videos. And then she—you know what? She recognized that car as Lakeisha Williams' car once she saw the video because, I guess, it was her sister's car, Lakeisha Williams' sister's car, and so the witness was able to say, yeah, that was one of the cars that Lakeisha drove around. But that was from the videos. It wasn't at the time of the murder. Did the videos show anybody carrying a gun? No, you couldn't see that from the video. Oh, I know the prosecutor did argue that there was something that might have looked like someone was carrying a gun, so the prosecutor did make that argument. I don't know how much—but then he also admitted, you know, it could have been an artifact. These videos are not— Who did it look like was carrying the gun? Excuse me, sorry. Who did it look like was carrying the gun? I believe he said that it looked like Mr. Prescott was carrying a gun from the videos. And the jury saw the videos, so they're free to determine what they think it showed. Yeah, that was up to the jury. Okay, any additional questions? Judge Collins, any additional questions? All right. Did either of you have any additional questions? No, but I would like to hear if there's any rebuttal. All right. I'll give you two minutes for rebuttal, okay? Okay. I think one of the most important things I need to correct is my opposing counsel's repeated statements that Jones did not try to take responsibility until after he was acquitted. That is false. He wrote a letter to the district attorney before trial. He gave it to his lawyer and asked his lawyer to give it to the district attorney. He gave a copy to Prescott. This is the one where he fingers Pooney. No, both of them. Both of them happened before trial. And he— The letter he writes to the DA is the one that mentions Pooney, right? No. The initial letter was to Prescott, and it mentioned Pooney. The second letter was to the DA, and it took full responsibility. Both of those letters occurred before trial and before he was acquitted. He explained in his interview and at the Marsden hearing during trial that he had tried to do this before any verdict was reached. So it's just not true that he tried to take responsibility after being acquitted. I also want to just point out that what the surveillance video shows is actually inculpatory in many ways because it shows that Vignon Perry's description better matches Jones than Prescott. She describes the shooter's hair in her initial interview and later, and Prescott was wearing a hat. She says that the shooter had a plain white shirt with nothing on it, and that is Jones, not Prescott. She said that the shooter wore light-colored jeans, and that's what Jones wore, not Prescott. And she described the shooter as running with a skipping gait, which the surveillance video shows Jones did as he exited the car and not Prescott. So this video is not— Does the video was at trial was—did anyone deny that Prescott was there in the video? Did anyone—did they try to say that wasn't Prescott in the video running out of the scene of the murder? No, Your Honor. I don't think there's ever been a dispute that Prescott and Jones were the people depicted in that video. And my only final point in my—am I over already? Yeah, but just wrap it up. The only other point is that to counsel's argument about the second letter being received in the middle of trial, this is a huge deal, and counsel could have moved for continuance. He could have done any number of things that he didn't do to ensure that this could come before the jury. Okay, thank you both for your argument in this matter. This case will stand submitted.
judges: BYBEE, CALLAHAN, COLLINS